Opinion issued December 29, 2011.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-11-00162-CV

———————————

In re M.T.W., A.N.W., and S.M.W.



 



 

On Appeal from the 314th District Court 

Harris County, Texas



Trial Court Case No. 2009-05167J

 



 

MEMORANDUM OPINION

          Appellant,
J.L.C., challenges the trial court’s decree terminating the parent-child
relationship between her and her three children, M.T.W, A.N.W., and S.M.W.  In four issues, she argues that the evidence
was legally and factually insufficient (1) to support termination of her rights
to the children under Texas Family Code section 161.001(1)(D); (2) to support
termination of her rights to the children under Family Code section
161.001(1)(E); (3) to support the finding that termination of her parental
rights was in the children’s best interest; and (4) to support the appointment
of the Department of Family and Protective Services (“DFPS” or “the
department”) as the sole managing conservator of the children.

          We affirm.

                                                                                                                                                                
Background

J.L.C. has three children
with M.W.:[1]
M.T.W., born August 7, 2003, A.N.W., born December 7, 2005, and S.M.W., born
June 23, 2007.  The children came into
the care of DFPS in July 2009 after J.L.C. left the two younger children,
A.N.W. and S.M.W., in the care of a babysitter and did not return for three
weeks.  M.T.W. had already been living
with his great-aunt Jean for two years prior to this incident.  DFPS initially created a service plan for
J.L.C. with the goal of reuniting her with her children.  However, on October 22, 2009, after J.L.C.
had a positive drug screening, the court ordered her visits with the children
suspended until (1) she had a negative drug screening, (2) her therapist
made a recommendation that she could act appropriately around the children, and
(3) the children’s therapist made a recommendation that visits with J.L.C. were
in their best interest.  Subsequently, in
2010, DFPS sought termination of J.L.C.’s parental rights and permanent
managing conservatorship of the children.

The termination trial was originally
convened on December 21, 2010, but it was postponed at DFPS’s request to allow
the department time to coordinate with the other parties, such as Child
Advocates, to put certain referrals in place for J.L.C. and to allow J.L.C.
time to complete a drug program.  The trial
to the bench reconvened on January 6, 2011. 
At the time of trial, M.T.W. was seven, A.N.W. was five, and S.M.W. was
three.

Jessie Binkley, the babysitter
with whom J.L.C. left her two younger children, testified at the termination
trial.  Binkley testified that her
neighbor used to babysit J.L.C.’s children and passed Binkley’s name along to J.L.C.
as someone who could also babysit.  Binkley
stated that she had known J.L.C. for three or four years and that the children
always appeared clean and dressed nicely when J.L.C. dropped them off for
babysitting.  J.L.C. brought enough
diapers and food for the children and appeared to interact appropriately with
them, although A.N.W. would sometimes say she did not want to go home because
of her father, M.W.

Binkley testified that in
the summer of 2009, J.L.C. dropped the girls off and said she would return the
next day.  However, J.L.C. did not return
the next day, and Binkley did not have any contact information or other way to
communicate with J.L.C.  Binkley
testified that the children’s father, M.W., came to her home approximately one
week after J.L.C. left them to bring diapers for the baby and some toys and
clothing, but Binkley would not let him take the children with him because he
appeared to be “under the influence of some type of drugs.”  She testified that she tried to ask M.W. about
what had happened to J.L.C., but “he would just smile and wouldn’t tell”
Binkley anything about J.L.C., so Binkley assumed “something had happened to
her.”  After three weeks had passed in
which she did not hear from J.L.C., Binkley called child protective services
(“CPS”), and she did not hear from J.L.C. again until after CPS had picked up
the children.

Binkley testified that she
was concerned about J.L.C. because “she and [M.W.] always would fight and [she]
was afraid that something had happened to her.” 
She testified that J.L.C. had told her on a previous occasion that M.W.
was violent toward her, and the children had also told her that there was
violence between the parents.  Specifically,
she testified that A.N.W. had brought up domestic violence on many occasions,
relating incidents when A.N.W. “saw her mamma getting dragged down the
street.  And she told me about an
incident where mamma got, I think, got shot in the shoulder.”  Binkley testified that around the time A.N.W.
said her mother was shot in the shoulder, Binkley observed J.L.C. with a
bandage on her shoulder, and Binkley had also observed bruises on J.L.C.’s face
at other times.

Binkley also testified that
A.N.W. once appeared with a “mark” on her forehead, which she originally
claimed was the result of a fall, but “then she turned around and said that her
dad—well she didn’t call him her dad, she said [M.W.] did this.”  Binkley stated that she had never seen J.L.C.
under the influence of drugs and was not aware that she distributed drugs.  She also testified that she had “concerns
about [J.L.C.] leaving the children with random people,” but, other than
herself and her neighbor, she was not aware of any other people with whom J.L.C.
left the children.

Ashley Robinson, a DFPS
caseworker, testified that she was the current case worker assigned to this
case.  She testified that M.T.W. was
currently living with a paternal great-aunt and that A.N.W. and S.M.W. were
living together in a therapeutic foster home. 
She testified that the department’s goal for the children was adoption
by their current guardians.  She also
testified that the children were allowed to interact with each other in their
current placements, which she believed would continue after adoption, and that
the children all expressed the desire to stay in their current placements and
were bonded with their current care-givers.

Regarding M.T.W.
specifically, Robinson testified that he had actually been placed with his
paternal great-aunt Jean “for quite a few years” and that he was voluntarily
placed there by his mother, and that, throughout the case, neither parent
expressed an interest in regaining custody of M.T.W.  Concerning A.N.W., Robinson testified that A.N.W.
made an outcry of sexual abuse by M.W. to her therapist, but A.N.W. made it
clear she did not want to discuss the incident further.

 Robinson testified that J.L.C. had multiple drug tests in which she
tested positive for cocaine, the latest one in August 2010, about four months
before trial.  However, Robinson also
testified that since August 2010, the department had performed a drug test on
J.L.C.’s urine that reflected a negative result.  Robinson spoke with J.L.C. about the positive
drug tests, and J.L.C. told her that she had never used drugs, but she sold
drugs.  According to Robinson, J.L.C.
believed that the drugs were “in her system because she holds the drugs in her
hands and also in her mouth in between her lips” as she sells them. 

Robinson testified that J.L.C.
was ordered not to have any contact with the children until she had a negative
drug test and until both J.L.C.’s therapist and the girls’ therapist
recommended that J.L.C. resume contact with the children.  She testified that the department never
received a negative drug test from J.L.C., and while her therapist recommended
that J.L.C. be allowed to contact the children, the girls’ therapist
recommended against further contact. 
However, according to Robinson, J.L.C. contacted M.T.W. in violation of
the order.  Robinson testified that J.L.C.
told her that “she received a call from [M.W.] stating that the child was at
the father’s mother’s house, which is the paternal grandmother.  She stated at that time that she did go to
the home and that she did see her son.” 
Robinson also asked M.T.W. about this visit, and he told her that “he
did see his mom and that his mom spoke to him and was asking him a lot of
questions.  He didn’t go in detail with
me about what the questions specifically [were] about, but he said it made him
a little nervous because she kept asking him questions and saying that he was gonna come home soon. 
And [M.T.W.] didn’t like that very much because he doesn’t want to go
home.”  

Robinson also testified
that J.L.C.’s representation that M.W. contacted her regarding taking M.T.W. to
his mother’s house was a cause for concern for the department, “especially
because [J.L.C.] said that she is not in contact with the father.  She also stated that if her children were
ever returned to her that she would be very protective of them and she wouldn’t
have contact with [him].  And they have
an extensive history of domestic violence in which the children have
witnessed.”

Robinson testified that
there had been several other case workers assigned to this case before her, and
that there had been some delay in making service referrals for J.L.C., but she
made all of the necessary referrals in August 2010.  She testified that she referred J.L.C. for a
drug abuse assessment, which J.L.C. completed in October 2010, and for a
psychological evaluation, which J.L.C. completed and followed up with
individual therapy.  Robinson was not
aware of whether J.L.C. had participated in any of the other recommended follow
up treatment from those two referrals. 
Robinson also stated that J.L.C. completed a domestic violence class
online on her own, but Robinson did not have any actual documentation of completion.
 J.L.C. also completed parenting classes.  

Robinson testified that the
department was not seeking termination based on failure to comply with the
family service plan, and that “[e]ven if J.L.C. has
successfully completed her services, the agency still has concerns about her
ability to parent her children safely.” 
Robinson testified that J.L.C. tested positive for drugs throughout the
case, that the department had not been able to verify her employment or how she
would financially be able to provide for the children, and that the department
was “concerned about her continued involvement” with M.W. “[b]ecause she’s still having contact with him.  The domestic violence that the children have
witnessed is very endangering to her as well as the children.”  

Robinson testified
regarding DFPS’s knowledge of M.W.’s previous arrests.  Evidence at trial showed that M.W. had a
November 14, 2003 conviction for delivery of cocaine, an October 24, 2005
conviction for delivery of cocaine, April 25, 2007 conviction for delivery of a
controlled substance, a June 27, 2008 conviction for possession of cocaine,
and, since the time DFPS became involved with these children, convictions for
possession of marijuana on September 4, 2009 and April 22, 2010 and two
convictions for assaulting J.L.C. on November 20, 2009 and June 29, 2010.  M.W. also repeatedly had positive drug
screens.  

The evidence at trial
indicated that J.L.C. had multiple positive drug screenings: a hair follicle
taken July 23, 2009 tested positive for cocaine, a hair follicle taken October
22, 2009, tested positive for cocaine, and a hair follicle taken September 23,
2010 tested positive for cocaine.  Robinson
testified that J.L.C. had not given the department any reason to believe that
she could remain drug free or that she would no longer have contact with M.W.

Robinson further testified
about J.L.C.’s previous referrals to CPS—once in 2006 “for possible neglectful
supervision because the child [A.N.W.] received a burn and they couldn’t
distinguish where that burn came from,” and once in 2003, regarding an
“actually validated lack of supervision for [M.T.W.].  And CPS could not provide the family with
services at that time because the family could not be located.  I believe they tried to contact the mother
and she was unable to be contacted.” 
Robinson acknowledged that there were no allegations of physical abuse against
J.L.C. and that she had never been in J.L.C.’s home, so she could not testify
regarding the physical conditions in the home.

Robinson testified that
both M.T.W. and A.N.W. had been diagnosed with ADHD and were both receiving
medication and treatment.

Yarnika
Miller, testified that she had been A.N.W.’s and S.M.W.’s therapist since they
were placed in the foster home in July 2009, at first on a weekly basis, and
then, at the time of trial, every other week. 
Miller testified that she had never met either parent.  She testified that A.N.W. “acted out certain
abuse in the home between mom and dad” in play therapy sessions, and that the
girls told her that M.W. would hit them, but they never mentioned that J.L.C.
hit them.  A.N.W. also related an
incident to Miller “where supposedly, I guess [M.W.] shot [J.L.C.] in the arm.”  Miller testified that when A.N.W. spoke about
her parents, “[s]he would become very anxious, very scared, nervous—almost like
in a panic attack which we have to calm her down and relax.”  She stated that the children called their
parents by their first names.

Miller also testified that
after she was informed by the caseworker at the time that A.N.W. had raised the
issue of possible sexual abuse by M.W., A.N.W. informed her that M.W. “would
pull down his pants and make her touch his private area.”  She stated that A.N.W. never indicated that J.L.C.
knew about the alleged abuse, saw it, or in some way allowed it to happen.  She also stated that she was aware A.N.W. was
given a forensic interview regarding the allegations of sexual abuse and that
nothing further developed as a result of that interview.  She testified that when she discussed the
possibility of returning to live with their parents, the children would say
they did not want to return and would begin to exhibit fear.  She testified that both children were doing
well in their current placement, were happy, and did not want to move.

Miller stated that, prior
to the court’s October 22, 2010 order, she recommended stopping contact between
the girls and J.L.C. because after A.N.W. would return from a visit, she would
“be very scared.  She would not
sleep.  She was acting out, being very
aggressive, just having a lot of problems at home.”  She testified that she believed the children
would be devastated if they were removed from their current foster home.  The trial court questioned Miller regarding
the effect termination of parental rights would have on the girls, and Miller
testified that A.N.W. and S.M.W. would not suffer any negative or adverse
effect from never seeing their parents again and would still be happy at their
current placement.

Cynthia Garrison, the Child
Advocates volunteer, testified that Child Advocates’ recommended goal was to
have parental rights terminated and have the children adopted by the foster
parent and relative.  She testified that
she visits the children’s homes once a month and that they all were doing
well.  Garrison testified that she had
spoken with each child individually, and all three had been very clear about
their desire to remain in their current homes, and when she raised the
possibility of returning to their biological parents, the children all told her
they did not want to go.  

Garrison testified that J.L.C.
also told her that she had never used drugs, but that the positive drug tests
resulted from J.L.C. carrying the drugs in her hand or mouth when she’s
delivering drugs to other people. 
Garrison also witnessed M.W. attempt to “pick a fight” with A.N.W. and S.M.W.’s
foster father during a court hearing in August, and M.W. had to be removed from
the courtroom.  Garrison also testified
that M.W. tested positive for cocaine in his urine that day.

Garrison stated that she
had reason to believe that J.L.C. and M.W. were still in a relationship, based
on information she received from M.W.  In
May 2010, M.W. told her he was residing at the same address as J.L.C.  She also testified about her conversation
with J.L.C. regarding her contact with M.T.W. in violation of the court’s
October 22, 2010 order.  J.L.C. told her,
“[A]t first she said she—they were at a park and she didn’t get out of the
car.  And after later questioning, she
said she saw him at a church and then she did get out of the car and spoke to
him and took some pictures.  But that was
it.”  However, M.T.W. told Garrison that
J.L.C. “came to the grandparents’ home, got out of the car, was asking him a
lot of questions.  And then told him that
they were gonna go to McDonalds and he said he did
not want to go to McDonalds and she forced him to go to McDonalds with
her.”  

She testified that she
believed the children would be in danger if they were returned to either parent
because M.W. “does say that he resides at [J.L.C.’s] whenever he’s—whenever he
can, and the fact that there has been two domestic abuse charges during this
time frame of the case.”  She also
testified that J.L.C. admitted she had contact with M.W. in November 2010,
leading up to her visit with M.T.W. in contravention of the court’s order, when
he called to tell her he had M.T.W. with him.

Benita, one the children’s
great-aunts, testified that she had a relationship with J.L.C., M.W., and the
children.  She testified that it was her
understanding that J.L.C. and M.W. still continued to have a relationship.  Benita testified that she took M.W. to J.L.C.’s
house in the fall of 2010, after he was released from prison, and she had no
reason to believe they were no longer romantically involved.  She further testified that she believed M.W.
sometimes lived with J.L.C. and sometimes lived with his mother.  She testified that she witnessed an incident
of domestic violence between J.L.C. and M.W. when they fought at her sister’s
home and hit each other.  She testified
that she observed J.L.C. with injuries and bruises that she understood J.L.C.
received in a “confrontation” with M.W. 
She testified that she did not believe the children should be in an
environment where the parents could not get along.

Great-aunt Jean testified
that she was M.T.W.’s current care-giver. 
She testified that she had taken care of M.T.W. “[j]ust
about all his life, off and on, but just really me keeping him, since about
four to five years.”  She testified that
J.L.C. and M.W. were both aware that M.T.W. was living with her, that they did
not attempt to take him from her home, and that they did not take care of him
or provide any type of financial support for M.T.W.

Jean also testified that M.T.W.
told her J.L.C. would slap him and “whoop” him and that he was afraid of her
slapping him.  M.T.W. also told Jean
about J.L.C.’s contact with him in November 2010.  Jean testified that M.T.W. said that his
mother came to his grandparents’ house and made him get in the car to go with
her to McDonalds.  Jean testified that M.T.W.
was upset by the visit because “he knew he wasn’t supposed to . . . be gone
with her.”  She also stated that M.T.W.
told her that “if he has to go live with them, well he’ll run away from home
and none of us will ever see him again.” 
She testified that she was willing to continue providing for and caring
for M.T.W. and would adopt him if J.L.C.’s and M.W.’s parental rights were
terminated.  She testified that she had a
good relationship with A.N.W. and S.M.W.’s foster parents and that they
communicate and allow the kids to see each other, which would continue in the
future.  She further testified that she
had heard through family that J.L.C. and M.W. were still in a relationship with
each other.

A.N.W. and S.M.W.’s foster
mother testified that she had been caring for A.N.W. and S.M.W. since July
2009, when they were three-and-a-half and two years old, respectively.  She and her husband wished to adopt the girls
if the parents’ rights were terminated. 
She testified that the girls “always say they would like to stay in our
home.  This is the only home they
know.”  The foster mother testified that
when conversations about J.L.C. and M.W. come up, A.N.W. would “act out.”  She said that S.M.W. was really young, so she
imitated A.N.W., but A.N.W. would cry, urinate on herself at night, and have
nightmares.  The foster mother testified
that “it’s mainly not the mother, it’s the father” that causes the acting
out.  The foster mother testified that A.N.W.
made an outcry of sexual abuse to her, indicating that M.W. made her touch his
private parts.

The foster mother also
testified that S.M.W. has had developmental problems and was seeing an
occupational therapist, a speech therapist, and physical therapist.  When asked the reason for that treatment, she
testified

They said drug usage, you know, undeveloped.  You know, she was taken off the bottle too
soon, so she doesn’t even know how to drink out of a straw.  Everything she gets, she flips over on
herself, you know even today.  They’re
still working with her.  She’s seeing a
urologist as well because they said her stomach was underdeveloped, you know
small.  And she was taken off the bottle
too early and put on table food, so she’s not, you know don’t know how to drink
and the muscle hadn’t been worked.

 

Frances Gerdes
testified that she was J.L.C.’s therapist and that J.L.C. had been referred to
her due to being involved in domestic violence. 
She testified that J.L.C. had a job when she first started seeing her
and later added a second job.  J.L.C. had
been in the same apartment for a year and had added bars on the windows for
safety reasons and to protect her against her ex-boyfriend.  She testified that J.L.C. had grown and
learned things during the time Gerdes had been seeing
her.  Gerdes
felt that J.L.C. had been open with her, except that J.L.C. had not told her immediately
that the department wanted to terminate her rights to the children.  Gerdes testified
that she did not find out that the department was seeking to terminate J.L.C.’s
parental rights until a couple of weeks before trial when Gerdes
attended a pre-trial hearing of some kind. 
Gerdes testified that J.L.C. “did not tell me
that.  And so we have talked about that
since and processes it.”  Gerdes felt that “there should be more time taken for
family therapy,” that J.L.C. “wants to have those children back,” and that it
might be “beneficial that they meet as a family before anything’s really,
really decided.”

Gerdes
testified that she had not really addressed any issues of drug use—she stated that
J.L.C. told her that she did not use drugs, but that she sold them.  On cross examination, counsel for DFPS
informed Gerdes that J.L.C. had tested positive for
cocaine three times, as recently as four months before trial and asked if that
caused her concern.  Gerdes
testified that it did cause her concern and that it was a concern for her as a
parent of children.  Gerdes
also testified that, as a licensed chemical dependency counselor, the fact that
J.L.C. denies using drugs in spite of positive drug tests caused concern that J.L.C.
might be in denial about a drug problem. 
Counsel for DFPS also informed Gerdes that
some witnesses had testified that J.L.C. and M.W. had had continued
contact.  Gerdes
testified that J.L.C. indicated in her sessions that she was not having contact
with M.W., but continued contact between J.L.C. and M.W. would cause her
concern, and she believed it would have a negative effect on the children.

Tanesha
Trevino, who had previously served as the department’s supervisor over the
case, testified that she was familiar with the majority of the facts of the
case.  She testified that, prior to the
court’s October 22, 2010 order suspending J.L.C.’s visits with the children, during
one of J.L.C.’s visits with the children at the CPS office, J.L.C. began to act
inappropriately.

[S]he kept asking the kids are you being beaten.  Are you being abused.  She saw one of the girls had a band-aid and
asked them what happened, she said she bit herself.  And the mom was asking, no, did someone else
do this to you.  And then started
proceeding to strip the girl’s clothes down to see if she could see any other
marks or bruises on her.

 

She
testified that both the case worker at the time and J.L.C. took pictures, that
an investigation was completed, and that CPS determined that there were no
signs of abuse of neglect by the foster parents.  Trevino testified that J.L.C.’s behavior
upset the children, that J.L.C. was informed that she needed to stop or CPS
would end the visit, and that CPS did “shortly after that” stop visitation
between J.L.C. and the girls based on their therapist’s recommendation.

Latoya Walters testified
that she had managed this case for approximately two months and that she was the
case manager during the incident recounted by Trevino.  She examined some of the pictures taken
during a visit between J.L.C. and the girls and she testified that the children
appeared to be smiling and happy.  She
testified that she did not recall many details about J.L.C.’s visits with the
girls.

J.L.C. testified at
trial.  She testified that she was aware
of the grounds being presented for termination, that she disagreed with the
termination, but that she “agree[d] of some of the behaviors that was going on
before and during this case.”  She
testified about her efforts to comply with her service plan.

She testified:

When I first came to court, I had already let the
courts know that I was going to be testing positive for cocaine because I had
been participating in selling the drugs. 
I had lost my job and that was the reason that I had at that time.  And then in 2010, August, I was just baffled.  I mean I did not know why I had tested positive.

 

She
testified that she went on her own to get a second screening test, which the
trial court admitted into evidence, and that test was negative.  J.L.C. testified that she had completed all
of the services requested or required by the department as part of her service
plan.

J.L.C. further testified
that she left the girls with Binkley in July 2009 because she was experiencing
financial hardship, she had already been turned away from a shelter, and she
was afraid of more rejection.  She knew
it was wrong to leave them with Binkley and not return, but she was scared and
embarrassed.  She testified that she
voluntarily left M.T.W. with the great-aunt several years previously when she
was jailed for two weeks, and that she had made one attempt around Easter of
2009 to resume custody of M.T.W.  This
attempt was cut short because M.W. was present and highly intoxicated, and the
police recommended to her that she leave M.T.W. where he was.

Regarding the visit with M.T.W.
in November 2010, which occurred against the court’s order that she suspend
contact with her children, she testified that she received a call from M.W. and
that she just saw M.T.W. at church and did not try to stop to talk to him and
did not take him to McDonalds.

J.L.C. testified that the
children had witnessed M.W.’s abuse of her:

When I tried to leave with them, on an occasion right
before they [were] taken into custody . . . [he] hit me with one of those toy
guns.  He hit me with it and that was in
front of [A.N.W.].  And I was trying to
leave down the street and he drug me back to the house. . . .

 

She also testified
regarding the two incidents of domestic violence that occurred since DFPS had had
custody of the children—one occurred at a corner store, and the other occurred
when M.W. appeared at her house.  She
testified that she immediately called police because of the protective order
that was in place, and she testified that she was the one who sought the
protective order.

She
testified that she did not live with M.W. and that they had not lived together
for years.  J.L.C. then testified:

I lived with him right when this incident first
happened, because I had lost my house in Pearland, that’s how this case even
came about is I went to live with him. 
Because his mother, she has a nice home, three bedrooms and I wanted
them to be comfortable and I didn’t have [any]where for my kids to go.  He would hardly be there, but when he was
around, he was abusive toward me.

 

She
testified that while M.W. came to her house after he was released from prison,
he left with Benita and did not stay.  J.L.C.
stated that M.W.’s mother called her within the last week before the trial
“saying that [M.W.] was passed out in the living room, come get your husband”
and that she occasionally paid M.W.’s mother to allow him to stay when he did
not have the money himself.

When asked what she was
going to do to prevent the domestic violence from recurring and placing the
children in an “uncomfortable” environment, she replied:

 Well I actually feel the same way about myself
and I really don’t want to be abused.  So
what I’ve done as far as myself is, I don’t want to have anything to do with
him but I won’t—I won’t have anything to do with him.  But I probably would need to continue to go
to counseling just to, you know, to keep myself going.  Because I been with him since I was 14.  I’m 26. 
So I probably would need counseling for that.

But
right now in my life, I just feel like I want to be with my kids more than I
want to be with him.  I choose to be
happy more than I choose to be unhappy. 
I choose to not [sic] getting
more marks and bruises as opposed to getting beat up and maybe not making it.

 

When asked how she took
care of her children prior to them coming into CPS custody, she replied that
she made sure they had everything they needed and that they were always clean
and happy.  She elaborated:

I was a suitable parent up until I had a financial
burden.  Then I went to stay with the
father.  He could not help me.  I took the kids to Ms. Binkley for
assistance.  I was wrong, but I didn’t
have anywhere to live.  I was selling
drugs, trying to go back home.

 

When asked
what she would do differently to prevent the same thing happening again, she
testified:

Well right now, I just main—I just want to maintain my
job.  But I’ve always—since this has been
going on, I have a problem with losing my place to live.  Like I get somewhere nice and I get
evicted.  So I’ve been here and here.  I paid my rent up three months extra.  I’m always gonna be
three months ahead of it.  So if I do lose
a job, that give me time to collect my unemployment or find a job.  So I made myself out like a little investment
like, so if I do, you know—it might happen. 
If it happens again, I’ll just do something different.  You know, I’ll be able to—my rent will be
paid up.  I can collect employment.  I have other avenues.

 

J.L.C. testified that she
had been employed as a receptionist and general office assistant for the past
year, and that she had provided support to her son in the form of money, gift
cards, and other items and gifts, and that she had also taken clothes and other
items to the girls.

The trial court then
questioned J.L.C. regarding her initial representations to him about the
circumstances leading up to CPS’s involvement in this case.  She originally told the trial court that the
father had dropped the kids off.  The
trial court asked why she lied, and J.L.C. replied that she was scared and she
just wanted her children.  The trial
court then requested an additional drug test, conducted by National Screening
Center.  J.L.C. also had another test
completed on her own with a different screening laboratory.

 The trial resumed once the drug test results were available.  Bruce Jeffries, an employee of National
Screening Center, testified that the drug test run on January 6, 2011 showed that
J.L.C. had been around marijuana and had ingested marijuana in the last 90
days.  The test also indicated the J.L.C.
had not been exposed to or ingested cocaine within the last 90 days.

Jeffries further testified
that the test indicated J.L.C. was not a chronic user and had not smoked
marijuana every day.  Regarding the
separate test obtained by J.L.C., Jeffries testified that the center where she
had the test done did not have a license to perform hair follicle testing and
that they did not report the type of testing they were attempting to run.  Jeffries testified that the family law center
does not accept the type of reports employed by the laboratory J.L.C. used to
complete her independent drug test.

The trial court terminated
J.L.C.’s parental rights based on Family Code section 161.001(1)(D) and (E) and
awarded permanent managing conservatorship to DFPS.  This appeal followed.

                                                                                                                                   
Sufficiency of Termination

In her first, second, and third issues, appellant argues
that the evidence is legally and factually insufficient to support the
termination of her parental rights.

A.              
Standard of Review

Section 161.001 of the Texas Family Code authorizes
involuntary termination of a parent-child relationship if the court finds by
clear and convincing evidence that the parent has committed at least one of the
acts or omissions listed in subsection (1) and that termination is in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001 (Vernon
Supp. 2011).  Clear and convincing
evidence is “the measure or degree of proof that will produce in the mind of
the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.”  Id. § 101.007 (Vernon 2008); In re
J.F.C., 96 S.W.3d 256, 264 (Tex. 2002). 


Because termination findings must be based upon clear and
convincing evidence, the Texas Supreme Court has held that, in a legal
sufficiency review, we look at all the evidence in the light most favorable to
the termination to determine whether a reasonable trier of fact could have
formed a firm belief or conviction that its finding was true.  In re
J.L., 163 S.W.3d 79, 84–85 (Tex. 2005); In re J.F.C., 96 S.W.3d at
266.  In viewing the evidence in the
light most favorable to the finding, we assume that the finder of fact resolved
disputed facts in favor of its finding if a reasonable fact finder could do so,
and we disregard all evidence that a reasonable fact finder could have
disbelieved or found to have been incredible. 
In re J.F.C., 96 S.W.3d
at 266.

In conducting a factual sufficiency review, we consider
the entire record, including evidence both supporting and contradicting the
finding, in determining whether a fact finder reasonably could have formed a
firm conviction or belief about the truth of the matter on which the State bore
the burden of proof.  Cervantes-Peterson
v. Tex. Dep’t of Family & Protective Servs.,
221 S.W.3d 244, 250 (Tex. App.—Houston [1st Dist.] 2006, no pet.).  We must give due consideration to evidence
that the fact finder could reasonably have found to be clear and convincing,
and we must consider the disputed evidence and determine whether a reasonable
fact finder could have reasonably resolved that evidence in favor of the
finding.  In re J.F.C., 96 S.W.3d at 266. 
“If, in light of the entire record, the disputed evidence that a
reasonable fact finder could not have credited in favor of the finding is so
significant that a fact finder could not reasonably have formed a firm belief
or conviction, then the evidence is factually insufficient.”  Id.

B.              
Evidence to Support Termination Under Section
161.001(1)(D) & (E)

In her first issue, J.L.C. argues that the evidence is
legally and factually insufficient to support termination of her parental
rights under section 161.001(1)(D).  In
her second issue, she argues that the evidence was insufficient to support
termination of her parental rights under section 161.001(1)(E).

A trial court only needs to make one finding of parental
misconduct under section 161.001(1) of the Family Code.  In re
A.V., 113 S.W.3d 355, 362 (Tex. 2003). 
Section 161.001(1)(D) provides that a “court may order termination of
the parent-child relationship if the court finds by clear and convincing
evidence . . . that the parent has . . . knowingly placed or
knowingly allowed the child to remain in conditions or surroundings which
endanger the physical or emotional well-being of the child. . . .”  Tex.
Fam. Code Ann. § 161.001(1)(D).  Section
161.001(1)(E) provides that a court may order termination if it finds by clear
and convincing evidence that the parent has “engaged in conduct or knowingly
placed the child with persons who engaged in conduct which endangers the
physical or emotional well-being of the child.” 
Id. § 161.001(1)(E).  

“‘To endanger’ means to expose a child to loss or injury
or to jeopardize a child’s emotional or physical helath.”  Jordan
v. Dossey, 325 S.W.3d 700, 723 (Tex. App.—Houston
[1st Dist.] 2010, pet. denied); In re
T.N., 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (citing In re M.C., 917 S.W.2d 268, 269 (Tex.
1996) (quoting Tex. Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987)).  A
child is endangered when the environment creates a potential for danger that
the parent is aware of but disregards.  Jordan, 325 S.W.3d at 721; In re M.R.J.M., 280 S.W.3d 494, 502
(Tex. App.—Fort Worth 2009, no pet.).  Subsection
(D) requires a showing that the environment in which the child is placed posed
a danger to the child’s physical or emotional health, and it permits
termination based on a single act or omission by the parent.  In re
L.C., 145 S.W.3d 790, 795–96 (Tex. App.—Texarkana 2004, no pet.); see Jordan,
325 S.W.3d at 721.  

Inappropriate, abusive, or unlawful conduct by persons who
live in the child’s home or with whom the child is compelled to associate on a
regular basis in his home is a part of the “conditions or surroundings” of the
child’s home under section 161.001(1)(D). 
Jordan, 325 S.W.3d at 721; In re M.R.J.M., 280 S.W.3d at 502.  Thus, although the focus of subsection (D) is
on the child’s living environment and not on the parent’s conduct, parental
conduct may produce an endangering environment. 
See Jordan, 325 S.W.3d at 721.  For example, abusive or violent conduct by a
parent or other resident of the child’s home, as well as illegal drug use and
drug-related criminal activity, support a conclusion that the children’s
surroundings endanger their physical or emotional well-being.  In re
J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

“Under subsection (E), the relevant inquiry is whether
evidence exists that the endangerment of the child’s physical well-being was
the direct result of the parent’s conduct, including acts, omissions, or
failures to act.”  Id.; see also Jordan, 325
S.W.3d at 723 (“The relevant inquiry is whether evidence exists that a parental
course of conduct endangered the child’s physical or emotional well-being.”).  Termination
under subsection (E) must be based on more than a single act or omission—the
evidence must demonstrate a voluntary, deliberate, and conscious course of
conduct by the parent.  Jordan, 325 S.W.3d at 723; In re J.T.G., 121 S.W.3d at 125.  “Although
‘endanger’ means more than a threat of metaphysical injury or the possible ill
effects of a less-than-ideal environment, it is not necessary that the conduct
be directed at the child or that the child actually suffers injury.”  In re
T.N., 180 S.W.3d at 383 (citing In re
M.C., 917 S.W.2d at 269); see also In
re J.O.A., 283 S.W.3d 336, 345 (Tex. 2009) (holding that endangering
conduct is not limited to actions directed toward child); Jordan, 325 S.W.3d at 723 (holding that danger to child need not be
established as independent proposition and may be inferred from parental
misconduct even if conduct is not directed at child and child suffers no actual
injury).  As a general rule, subjecting a child to a
life of uncertainty and instability endangers the child’s physical and
emotional well-being.  See In re S.D., 980 S.W.2d 758, 763
(Tex. App.—San Antonio 1998, pet. denied); see
also Jordan, 325 S.W.3d at 724 (“Abusive and violent criminal conduct by a
parent can produce an environment that endangers the well-being of a child.”).  

Danger to the child’s well-being may be inferred from
parental misconduct alone, and courts may look at parental conduct both before
and after the child’s birth.  See Boyd, 727 S.W.2d at 533; In re D.M., 58 S.W.3d 801, 812 (Tex.
App.—Fort Worth 2001, no pet.).  “A
parent’s engaging in illegal drug activity after agreeing not to do so in a
service plan for reunification with her children is sufficient to establish
clear and convincing proof of voluntary, deliberate, and conscious conduct that
endangered the well-being of her children.” 
In re T.N., 180 S.W.3d at 383
(citing Robinson v. Tex. Dep’t of
Protective & Regulatory Servs., 89 S.W.3d
679, 686–87 (Tex. App.—Houston [1st Dist.] 2002, no pet.)).

Because the evidence concerning these two statutory
grounds for termination is interrelated, we consolidate our examination of
it.  See
In re J.T.G., 121 S.W.3d at 126 (citing In
re S.D., 980 S.W.2d at 762 and In re
B.R., 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) (recognizing
link between parent’s conduct and child’s conditions and surroundings)).

Here, DFPS presented evidence that J.L.C. committed acts
that endangered the children and that created an environment that endangered
the children.  J.L.C.’s own testimony
revealed that she was involved in illegal drug activity and failed to provide
stable living arrangements.  J.L.C. also
acknowledged that she left her children with Binkley, did not provide any
contact information, and did not return for more than three weeks.  DFPS presented evidence that J.L.C. had
multiple positive drug screenings, including testing positive for marijuana at
the time of trial.  See In re J.T.G., 121 S.W.3d at 125 (holding that illegal drug use
and drug-related criminal activity support conclusion that children’s
surroundings endanger their well-being); In
re S.D., 980 S.W.2d at 763 (holding that subjecting children to life of
uncertainty and instability endangers their well-being); see also In re T.N., 180 S.W.3d at 383 (holding that parent
engaging in illegal drug activity after agreeing not to in service plan is
sufficient to establish clear and convincing proof of voluntary, deliberate,
and conscious conduct that endangered children’s well-being).

Furthermore, DFPS presented evidence that J.L.C. knowingly
placed her children in surroundings and exposed them to danger through her
continued relationship with M.W.  The
evidence at trial showed that M.W. was a repeat drug offender who was also
violent and abusive toward her and the children.  J.L.C. was aware of this behavior, and she
testified that the children witnessed M.W.’s abuse of her.  Both of the children’s great-aunts, Benita
and Jean, testified that they understood that J.L.C. had an ongoing
relationship with M.W., and Cynthia Garrison, the Child Advocates volunteer,
testified to her belief that J.L.C. and M.W. still lived together, at least occasionally,
based on information she received from M.W.  See Jordan,
325 S.W.3d at 721 (holding that inappropriate, abusive, or unlawful conduct by
persons who live in children’s home or with whom child is compelled to
associate on regular basis is part of “conditions and surroundings”).

Thus, viewing the evidence in the light most favorable to
the termination, we determine that the trial court reasonably could have formed
a firm belief or conviction that J.L.C. “knowingly placed or knowingly allowed
the [children] to remain in conditions or surroundings” that endangered their
well-being and that J.L.C. “engaged in conduct or knowingly place[d] the
[children] with persons who engaged in conduct” that endangered them.  See Tex. Fam. Code. Ann. § 161.001(1)(D),
(E); In re J.L., 163 S.W.3d at 84–85
(providing standard of review for legal sufficiency challenges in termination
proceedings).

J.L.C. argues that her own testimony and the testimony of
Binkley indicated that the children were clean, well-dressed, and happy when
they were in JLC’s care, and that “[t]here was no evidence as to the conditions
or surroundings of any of the homes that the children were living in prior to
the filing of the petition.”  However, as
we have already discussed, evidence of the environment in which the children
live can encompass more than the physical characteristics of a home.  See
M.R.J.M., 280 S.W.3d at 502 (holding that inappropriate, abusive, or
unlawful conduct by persons who live in child’s home or with whom child is
compelled to associate on regular basis is part of “conditions and
surroundings” under section 161.001(1)(D)). 
DFPS presented evidence that that there was a history of CPS involvement
with the family, that prior to the department taking custody of the children,
J.L.C. had been unable to provide stable living conditions—M.T.W. had been
living with his great-aunt for most of his life and J.L.C. testified that she
left the girls with Binkley because she was unable to care for them—and that
the children were repeatedly exposed to domestic violence and illegal drug
activity through J.L.C.’s relationship with M.W. in the years leading up to
July 2009. 

J.L.C. also argues that any evidence of her post-petition
relationship with M.W. is insufficient to support termination of her parental
rights under section 161.001(1)(E) because DFPS was required to prove
“endangerment by past conduct not future conduct.”  This argument ignores the evidence demonstrating
J.L.C.’s own conduct that endangered the children and led to the children
coming into DFPS custody, including her admitted inability to provide a stable
home and her involvement selling drugs. 
J.L.C. also appears to argue that the children were afraid of M.W., not
her.  However, the girls’ therapist, great-aunt
Jean, and the girls’ foster mother all testified that the children reacted
badly to discussions about both parents and that they did not desire to live
with either parent.  

Finally, J.L.C. argues that no one testified that they
ever saw her under the influence of illegal drugs or suspected that she abused
drugs.  She also points out that she had
at least one negative drug test of her urine since August 2010.  However, J.L.C. admitted that she had sold
drugs in the past, including at the time DFPS took custody of her children and
on subsequent occasions.  She also had
multiple positive drug screenings, including testing positive for marijuana
consumption at the time of trial.  

J.L.C. challenges the reliability of the drug testing for
the first time on appeal and challenges the admissibility of expert testimony
on this subject, based mainly on the methodology of hair follicle testing.  However, she did not make any objection to
this evidence in the trial court, nor did she raise it in her motion for new
trial, thus we do not consider this issue. 
See Tex. R. App. P. 33.1(a) (providing that, as prerequisite to
appellate review, appellant must present trial court with timely request,
objection, or motion); Coastal Transp.
Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 233 (Tex. 2004)
(“[W]hen a reliability challenge requires the court to evaluate the underlying
methodology, technique, or foundational data used by the expert, an objection
must be timely made so that the trial court has the opportunity to conduct this
analysis.”);[2] cf. Nip v. Checkpoint Sys., Inc., 154
S.W.3d 767, 770–71 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (refusing to
consider challenges to reliability of expert report raised for first time in
motion for new trial).  Furthermore, the
fact finder is the sole judge of the weight and credibility of the evidence,
and we may not substitute our own opinions to the contrary.  See City
of Keller v. Wilson, 168 S.W.3d 802, 819 (Tex. 2005).

Thus, considering the entire record, including evidence
both for and against the termination finding, we conclude that the trial court
reasonably could have formed a firm belief or conviction that J.L.C. committed
the acts or omissions listed in Family Code section 161.001(1)(D) and (E).

We overrule J.L.C.’s first and second issues.

C.              
Evidence of the Best Interest of the Children

In her third issue, appellant argues that the evidence is
legally and factually insufficient to support the trial court’s finding that
termination of her parental rights was in the best interest of the children.

There is a strong
presumption that the best interest of the child will be served by preserving
the parent-child relationship.  In re. R.R., 209 S.W.3d 112, 116 (Tex.
2006) (per curiam).  Prompt and permanent
placement of the child in a safe environment is also presumed to be in the
child’s best interest.  Tex. Fam. Code Ann. § 263.307(a)
(Vernon 2008).  Among
others, the following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment: the
child’s age and physical and mental vulnerabilities; the frequency and nature
of out-of-home placements; the willingness and ability of the child’s family to
seek out, accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency’s close supervision; and whether an adequate social
support system consisting of an extended family and friends is available to the
child.  Id. § 263.307(b).

The Texas Supreme Court has set out some additional factors that courts can consider when
determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical
danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best
interest of the child; (6) the
plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse
for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371–72
(Tex. 1976).  This is not an exhaustive
list, and a court need not have evidence of every element listed in order to
make a valid finding as to the child’s best interest, especially when there is
undisputed evidence that the parental relationship endangered the child.  In re C.H., 89 S.W.3d 17, 27 (Tex.
2002).  While no one factor is
controlling, analysis of a single factor may be adequate in a particular
factual situation to support a finding that termination is in the best interest
of the child.  See In re A.P., 184 S.W.3d 410, 415 (Tex. App.—Dallas 2006, no
pet.) (citing In re C.H., 89 S.W.3d
at 27).

We have already concluded that J.L.C.’s past conduct
endangered the children, and our analysis of other factors also supports the
trial court’s finding that termination was in the children’s best interest.

1.                
The
desires of the children, their ages, and their present and future emotional and
physical needs

The evidence demonstrated that the children all expressed
a desire to remain in their current placements and that the children were
afraid to return to their parents.  J.L.C.
argues that there was no evidence that the children were afraid of her.  However, great-aunt Jean testified that
M.T.W. told her he was afraid of J.L.C. slapping him and that he would run away
if he was forced to go back with his parents. 
A.N.W. and S.M.W.’s foster mother and therapist both testified that the
children reacted badly to the mention of either of their parents.  They also testified that A.N.W. exhibited stress
and regressive behavior after visiting her mother.  Furthermore, the evidence shows that the
children’s current placements were the only homes the children were truly
familiar with, as M.T.W. had been with his great-aunt since he was four, and
the two girls had been with their foster parents since they were
three-and-a-half and two years old.  All
three children have significant physical and mental needs requiring long-term
care and stability, including M.T.W.’s and A.N.W.’s ADHD and S.M.W.’s
developmental delays, which, according to her foster mother’s testimony, were
likely caused by exposure to drugs during gestation.

2.                
Frequency
and nature of out-of-home placements

The evidence also showed that M.T.W. had already been
subject to a voluntary out-of-home placement by J.L.C. and that she had made
only one effort to regain custody of him. 
Furthermore, J.L.C. voluntarily left the two girls with a babysitter for
three weeks without providing any contact information.  DFPS also presented evidence that there was a
history of CPS involvement with the family prior to the department taking
custody of the children.

3.                
Present
and future emotional and physical danger to children, J.L.C.’s parental
abilities, acts, and omissions, and excuses for J.L.C.’s acts and omissions

As we have already discussed, the evidence was also
sufficient to show that the children were endangered while living with J.L.C.,
and the evidence likewise supports a finding by clear and convincing evidence
that they would likely continue to be endangered in the future.  J.L.C. admitted that she had had trouble
maintaining a steady residence “since this whole thing started” and several
relatives and the Child Advocates’ volunteer all testified that they believed
J.L.C. had an ongoing relationship with M.W. 


J.L.C. argues that her own testimony indicated that she no
longer had contact with M.W., and she argues that terminating her parental
rights is essentially punishing her for being a victim of domestic
violence.  However, J.L.C. also testified
that she left her children with Binkley in July 2009 because she was moving in
with M.W., she acknowledged she was in contact with him in November 2010
regarding M.T.W.’s whereabouts, and she acknowledged that, as recently as the
week preceding trial, M.W.’s mother called her to come get M.W. from his
mother’s house.  

4.                
J.L.C.’s
willingness to seek out and complete services and cooperate with programs
available to her

J.L.C. has shown a willingness and ability to seek out,
accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency’s close supervision in some respects, but she also failed
numerous drug tests.  The evidence also
indicates that she was not entirely candid with her therapist.  In spite of the therapy and other programs
J.L.C. completed, the department presented evidence that she had failed to
confirm her length of employment and failed to demonstrate that she would
remain drug free and uninvolved with M.W.

5.                
DFPS’s
future plans for children, stability of proposed placements, social support
system of extended family and friends available to children

Finally, DFPS presented evidence that it was seeking
adoption of all three children by their current placements, that the children
were bonded to their current care-givers and had the opportunity to communicate
with each other, and that the current care-givers were able to provide the care
and support the children needed.  DFPS
proposes to have M.T.W. adopted by a family member, his great-aunt.  Furthermore, all three children are currently
able to socialize with each other, and both proposed sets of adoptive parents
testified that they anticipated that the children would be able to continue to
do so in the future.  The proposed
placements also indicated that they have been meeting the children’s needs for
stability and appropriate medical and mental-health care since taking in the
children and that they plan to continue to do so in the future.

We have concluded that J.L.C.’s has previously endangered
her children.  The analysis of the
evidence of the children’s best interest indicates that, although J.L.C. made
progress in complying with her DFPS service plan and attempted to eliminate
contact with M.W. and with drug activity from her life, she still demonstrated
a tendency to be involved with M.W. and failed a drug test even at the time of
trial.  The evidence also indicates that
J.L.C. is unlikely to be able to provide stable and safe, violence-free living
conditions in the future.  Additionally,
DFPS plans to provide permanent placements for the children that will provide
continuity with their current care-givers, stability, and a continued
relationship with each other and with some extended family members.  Thus, we conclude that the evidence is both legally
and factually sufficient to support the trial court’s finding that termination
was in the children’s best interest.  

We overrule J.L.C.’s third issue.

                                                                            
Appointment of DFPS as Sole Managing Conservator

In her fourth issue, J.L.C. argues that the evidence was
legally and factually insufficient to support the trial court’s appointment of
DFPS as the sole managing conservator of the children.

There
is a rebuttable presumption that it is in a child's best interest for his
parents to be named his joint managing conservators.  Tex.
Fam. Code Ann. § 153.131(b) (Vernon 2008).  In order to rebut this presumption and
appoint someone other than a parent as sole managing conservator of the child,
a court must find that appointment of a parent would “significantly impair the
child's physical health or emotional development.”  Id. § 153.131(a); In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007).  Additionally, “[t]he best interest of the
child shall always be the primary consideration of the court in determining the
issues of conservatorship[.]”  Tex. Fam. Code Ann. § 153.002 (Vernon
2008).  Unlike the standard of proof for
termination of parental rights, the findings necessary to appoint a non-parent
as sole managing conservator need only be established by a preponderance of the
evidence.  Id. § 105.005 (Vernon 2008); J.A.J.,
243 S.W.3d at 616. 

Likewise,
the standard of review for the appointment of a non-parent as sole managing
conservator is less stringent than the standard of review for termination of
parental rights.  J.A.J., 243 S.W.3d at 616.  We
review a trial court’s appointment of a non-parent as sole managing conservator
for abuse of discretion only.  Id.
(citing Gillespie v. Gillespie,
644 S.W.2d 449, 451 (Tex.1982)). Therefore, we will reverse the trial court’s
appointment of a non-parent as sole managing conservator only if we determine
that it is arbitrary or unreasonable.  Id.

We have already concluded that the evidence was
sufficient to support termination of J.L.C.’s parental rights under the higher,
clear-and-convincing burden.  Thus, we
conclude that the trial court did not abuse its discretion in appointing a
non-parent, DFPS, as the sole managing conservator of the children.  See
Quiroz v. Dep’t of Family & Protective Servs.,
No. 01-08-00548-CV, 2009 WL 961935, at * 11 (Tex. App.—Houston [1st Dist.] Apr.
9, 2009, no pet.) (mem. op.) (refusing to consider
issue challenging sufficiency of evidence supporting DFPS’s appointment as sole
managing conservator when court had already upheld trial court’s termination of
parental rights).

We overrule J.L.C.’s fourth issue.

                                                                                                                                                                   
Conclusion

We affirm the judgment of the trial court.

 

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel consists of Justices Keyes, Higley, and
Massengale.

 











[1]           M.W.’s parental rights were also
terminated by the trial court, but he is not a party to this appeal.





[2]           Coastal
Transport Co. stated that when a party challenges the admissibility of an
expert opinion for the first time on appeal—without having objected at trial—that party is restricted
to complaining about errors that appear on the face of the record, i.e., that
the expert testimony is speculative or conclusory on
its face.  Coastal Transp. Co. v. Crown
Cent. Petroleum Corp., 136
S.W.3d 227, 233 (Tex. 2004).  J.L.C. does
not argue that the drug reports and the testimony of Jeffries were speculative
or conclusory on their face.